UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
GAIL SOBEL, individually, and AES and RJS
by GAIL SOBEL as their parent and natural
guardian,

                         Plaintiff,                   **MEMORANDUM & ORDER**

      -against-                              12 CV 3258  (DRH) (WDW)

A. GAIL PRUDENTI, as Chief Administrative
Judge of the NEW YORK STATE OFFICE OF
COURT ADMINISTRATION, Administrative
Arm of the Unified Court System of the State of
New York, HARRIET WEINBERGER, as
Director of OCA Attorneys for Children Program
for the Second Judicial Department, HOPE
SCHWARTZ ZIMMERMAN, a Justice of the
Supreme Court of the State of New York in her
official and personal capacity, ROBERT
TRUZOLLINO, NASSAU COUNTY
COMMISSIONER OF JURORS, KATHLEEN
DRISCOLL HOPKINS, as Chief Clerk of the
Supreme Court of the State of New York in and for
Nassau County, MAUREEN O'CONNELL, as
Nassau County Clerk, and John Does 1-10,

                         Defendants.
-----------------------------------------------------------X
**APPEARANCES:**

**THE LAW FIRM OF JEFFREY L. SOLOMON, PLLC**
Attorneys for Plaintiffs
180 Froehlich Farm Blvd.
Woodbury, NY 11797
By: Jeffrey L. Solomon, Esq.

**ERIC T. SCHNEIDERMAN**
**Attorney General of the State of New York**
Attorney for the State Defendants
300 Motor Parkway, Suite 205
Hauppauge, New York 11788
By: Anne C. Leahey, Esq.

**HURLEY, Senior District Judge:**

Plaintiffs Gail Sobel ("Plaintiff" or "Sobel"), individually, and AES and RJS ("AES and RJS") by Sobel as their parent and natural guardian (collectively, "Plaintiffs"), filed the present action against A. Gail Prudenti ("Prudenti"), as Chief Administrative Judge of the New York State Office of Court Administration ("OCA"), Harriet Weinberger, as Director of OCA Attorneys for Children Program for the Second Judicial Department ("Weinberger"), Hope Schwartz Zimmerman, a Justice of the Supreme Court of the State of New York in her official and personal capacity ("Zimmerman"), Robert Truzzolino, Nassau County Commissioner of Jurors ("Truzzolino"),[1] Kathleen Driscoll Hopkins, as Chief Clerk of the Supreme Court of the State of New York in and for Nassau County ("Hopkins"), Maureen O'Connell, as Nassau County Clerk ("O'Connell"), and John Does 1-10 (collectively, "Defendants"), under Title II of the American with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act, 42 U.S.C. § 1983, the United States Constitution, and the Constitution of the State of New York, claiming that Defendants violated Plaintiffs' rights during a child support dispute in state court.

Defendants move to dismiss the Complaint pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(1) on the bases of absolute judicial immunity, the *Younger* abstention doctrine, the domestic relations exception, and Eleventh Amendment immunity, and pursuant to Rule 12(b)(6) for failure to state a claim under Title II of the ADA. For the reasons set forth below, Defendants' motion to dismiss is granted.

---

[1] The Court notes that Truzzolino's name is misspelled throughout the Complaint, including in its caption, as Truzollino.

## BACKGROUND

The following facts are taken from the Complaint and are presumed true for purposes of this motion.

Sobel, an adjunct college professor who earns approximately $30,000 per year, resides in Nassau County, New York, and is the mother and sole legal custodian of minor children, AES and RJS. (Compl. ¶¶ 1, 3, 4, 5.) Prudenti is the "Chief Administrative Judge of the OCA," who is "responsible for the operation and function of the OCA," and the daily operations of the Family Court and Supreme Court. (*Id.* ¶¶ 8, 9.) Zimmerman, an elected Justice of the Family Court, "was appointed as the acting Supervising Justice of the Matrimonial Center" of the Supreme Court in Nassau County. (*Id.* ¶¶ 10, 11.) Truzzolino, "the Nassau County Commissioner of Jurors," is "the designated ADA coordinator for the Supreme Court" in Nassau County. (*Id.* ¶ 13.) Hopkins is the Clerk of the Supreme Court in Nassau County, and "is required by law to consult with the designated ADA liaison for the Supreme Court [in Nassau County] in order to determine which reasonable accommodations must be granted to persons asserting their rights under the ADA." (*Id.* ¶ 14.) In addition, "Hopkins is responsible for maintaining the completeness and integrity of the files for each and every case pending in the Supreme Court, Nassau County." (*Id.* ¶ 15.) O'Connell is the Nassau County Clerk, and "is responsible for maintaining the completeness and integrity of files for cases pending in the Supreme Court, Nassau County." (Compl. ¶ 16.) Weinberger "is the Supervisor, or Supervising Justice of the OCA's Attorney for Children Program (the "Program")" for the Appellate Division, Second Department, and "is responsible for, *inter alia*, the function and operation of

3

the Program, including but not limited to the supervision and training of attorneys who perform services for and pursuant to the Program." (*Id.* ¶¶ 17, 18.)[2]

Sobel is the Respondent in a proceeding that is currently pending before the Supreme Court in Nassau County, captioned, "Lew v. Sobel" ("Pending State Court Action"). (*Id.* ¶ 24.) The Pending State Court Action was brought by Mark Lew ("Lew"), "a wealthy pediatrician and businessman, and the father of AES and RJS, born out of wedlock to Plaintiff and Lew, to terminate his child support obligations to Plaintiff and [AES and RJS]" and gain custody of AES and RJS. (*Id.* ¶¶ 25, 27.) After trial of the matter, an order was issued by the Supreme Court on April 28, 2006 ("April 28, 2006 Order"), which denied a change of custody to Lew, and denied the termination of Lew's child support obligation. (*Id.* ¶¶ 27, 28.) Despite Lew's right to visitation pursuant to the April 28, 2006 Order, Lew has not visited his children for over six years. (*Id.* ¶ 26.) Since the time of the trial, "nearly 40 post-trial motions were made in the Supreme Court." (*Id.* ¶ 30.)

"Even though the April 28, 2006 Order reserved to the Family Court all matters 'of child support and ancillary issues,' . . . the Supreme Court issued multiple orders, without conducting any hearings or evidentiary proceedings." (Compl. ¶ 33.) Lew appealed the April 28, 2006 Order and, on December 26, 2007, the Appellate Division held, "although apparently not asked to do so in the appeal," that half of the monthly child support payments should be put in the escrow account of Plaintiff's attorney pending Plaintiff's certification to the Supreme Court that she had not interfered with Lew's visitation rights under the April 28, 2006 Order. (*Id.* ¶¶ 41, 48.) In addition, the Appellate Division "retroactively reallocate[d] the forensic and related trials costs from 90% for Lew and 10% to Plaintiff, to 75% to Plaintiff, and 25% to Lew, without

---

[2] Despite the fact that the Complaint's caption does not name the OCA as a defendant, paragraphs 6 and 7 of the Complaint identify the OCA as a defendant in this action.

considering statements of net worth or considering the impact of the order on [AES and RJS], as required by law."  (*Id.* ¶ 48.)

The appellate oral argument occurred "in a small room on the third floor of the building, away from the public, and in a secure area of the building, inaccessible except by court personnel," rather than in the courtroom, and was attended by the parties, their attorneys, Lew's wife, and the wife of Lew's attorney.  (*Id.* ¶¶ 42, 44.)  The wife of Lew's attorney served on bar association committees with some of the Justices of the Appellate Division, and Lew contributed to the campaigns of political and judicial candidates.  (*Id.* ¶ 46.)  Ann Block, the appointed Law Guardian for AES and RJS, did not attend the oral argument as her appointment had expired upon the termination of the trial and her submission of an appellate brief.  (*Id.* ¶ 45.)  After Block's appointment expired, during the years 2007 through 2010, AES and RJS did not have an attorney or law guardian, even though "dozens of motions were filed."  (Compl. ¶ 50.)  For much of 2007 through the present, Plaintiff represented herself, *pro se*.  (*Id.* ¶ 58.)

Lew moved in the Supreme Court for a reallocation of the trial expenses as per the Appellate Division's Order.  (*Id.* ¶ 62.)  "As Lew made no effort[ ] to visit the parties' [children] from April 2006 to the time of the motion and beyond, Plaintiff cross-moved and certified to the Supreme Court that she did not interfere with Lew's visitation rights, as per the Appellate Division Order."  (*Id.*)  Plaintiff, who was proceeding *pro se* at the time, was "unaware of her right to contest the Supreme Court's jurisdiction," or of the right for AES and RJS to be represented in the post-trial proceedings that affected "their right to be supported by their father." (*Id.* ¶ 64.)  The Family Court provides greater resources to assist *pro se* litigants than does the Supreme Court's *pro se* office.  (*Id.* ¶ 65.)

On March 9, 2008, Supreme Court Justice Randi Sue Marber, without having held a hearing or receiving any evidence regarding Plaintiff's certification that she had not interfered with Lew's visitation, rendered a decision requiring Plaintiff to pay nearly $70,000 to Lew in a reallocation of fees ("March 2008 Order"). (Compl. ¶¶ 67, 69.) The March 2008 Order "completely misconstrued, or deliberately ignored the express language of the Appellate Division Order, which made interference with 'visitation' the operative criteria[,] not 'alienation'." (*Id.* ¶ 69.) Justice Marber also "failed to ensure that the interests of [AES and RJS] were represented." (*Id.*) Plaintiff appealed the March 2008 Order, but did not perfect the appeal as she did not have counsel to assist her or adequate resources to manage the appeal on her own. (*Id.* ¶ 74.) Lew failed to timely perfect his cross-appeal. (*Id.*) Plaintiff also moved to renew and reargue the March 2008 Order ("Renewal Motion"), and Lew moved to reargue portions of it. (*Id.*)

In February 2009, the case was reassigned to Justice Robert Ross, who issued a summary decision on December, 3, 2010 denying Sobel's Renewal Motion. (Compl. ¶¶ 75, 76, 78.) The issuance of the decision two and one-half years after the Renewal Motion was submitted, was in violation of "DCM guidelines," which requires a decision within 60 days of the motion's submission, and deprived Plaintiffs the benefit of one half of the monthly child support from Lew. (*Id.* ¶¶ 76, 77.) Prior to his issuance of a decision on the Renewal Motion, Justice Ross "admitted on the record of proceedings that the Supreme Court's files were 'in a state of complete discombobulation,' and that unspecified numbers of files pertaining to the Pending [State Court Action] and various motions appeared to be missing and incomplete." (*Id.* ¶ 79.) Justice Ross did not issue his decision on the Renewal Motion "until he was served with Plaintiff's Order to Show Cause and Motion under Article 78 of the NYCPLR in December

2010, alleging decisional delay and other misconduct." (*Id.* ¶ 82.) Moreover, on the same day the Renewal Motion was denied, Justice Ross decided several other motions that were "based on admittedly incomplete files." (*Id.* ¶¶ 84, 85.) However, "the Appellate Division refused to throw out or vacate any of Justice Ross'[s] or Justice Marber's decisions or orders." (*Id.* ¶ 88.) Justice Ross knew that AES and RJS were not represented by an attorney or law guardian from March 2008 through December 2010. (Compl. ¶¶ 92, 93.)

In 2009, Lew again moved to terminate his child support obligation and to obtain release of the escrowed child support money. (*Id.* ¶ 95.) That motion is currently pending. (*Id.*) In addition, in March 2009, Lew moved to have the balance of child support being paid to Plaintiff paid into escrow instead, "and asked the Supreme Court to in effect modify the Appellate Division Order and transfer the escrowed funds to the accounts of Lew's attorneys . . . , and to force payment of all of the child support being paid for the benefit of [AES and RJS] to be confiscated and placed into the escrow account of Lew's counsel" ("Support Segregation Motion"). (*Id.* ¶ 96.) Although the court was aware that Plaintiff was in a hospital emergency room and unable to attend the court's proceedings, and that she was appearing *pro se*, the court granted Lew's motion on September 20, 2010 without a hearing. (*Id.*)

Justice Ross also "entertain[ed] and decide[d] a number of motions by Lew's counsel [to] disqualify various attorneys that Plaintiff had engaged, or attempted to engage." (*Id.* ¶ 98.) Indeed, at a "July 14, 2010 'conference in aid of disposition,' Justice Ross forced Plaintiff's counsel, Douglas M. Reda, Esq., to resign as counsel under threat of sanction and contempt." (Compl. ¶ 99.)

Because Plaintiff was unable to attend the September 20, 2010 conference, which was another "conference in aid of disposition," it was rescheduled by the court for September 22,

2010. (*Id.* ¶ 101.) Plaintiff appeared at the September 22, 2010 conference, *pro se*, but had engaged a *per diem* attorney to assist her in the proceedings; however, Justice Ross refused to allow the *per diem* attorney to participate. (*Id.* ¶ 102.)

Justice Ross was "abusive and hostile" to Plaintiff at the September 22, 2010 conference, and, as a result, Plaintiff began "experienc[ing] heart attack like symptoms, including shortness of breath, chest pain, and a severe anxiety and panic attack." (*Id.* ¶ 103.) "Justice Ross refused Plaintiff's continued and repeated requests for medical attention, and . . . accused Plaintiff of 'deliberately regurgitating' on herself . . . ." (*Id.* ¶ 104.) Justice Ross further notified Plaintiff that he was calling security or the police. (*Id.* ¶ 106.) Although Justice Ross called for medical help after Plaintiff's attorney-husband came to the courthouse, the paramedics were directed to go directly to Justice Ross's chambers rather than immediately provide care to Plaintiff. (Compl. ¶¶ 107, 108.) Justice Ross or other OCA personnel instructed court personnel to deny Plaintiff the ability to speak directly with her physician via cell phone, despite her demands. (*Id.* ¶ 110.) Similarly, Plaintiff's husband was initially denied permission to speak with Plaintiff's physician, but was ultimately allowed to do so upon his challenging and confronting the court officers. (*Id.* ¶ 109.)

Plaintiff was admitted to the cardiac care unit of the hospital, where she remained overnight. (*Id.* ¶ 111.) Subsequently, Justice Ross "sanctioned Plaintiff $2,000 for taking ill on September 22, 2010, . . . made Plaintiff's medical records . . . available to Lew's counsel, and allowed [Lew's counsel] to remove the records from the courtroom." (*Id.*) In addition, after Plaintiff left the courthouse on September 22, 2010 by ambulance, Justice Ross engaged in a series of *ex-parte* communications with Lew's counsel regarding Lew's Support Segregation Motion, "including written communications referring to approval by Justice Ross of certain 'pre-

screen' memos in connection with the motion," which had never been provided to Plaintiff.  (*Id.* ¶ 113.)

On October 14, 2010, Justice Ross "issued an order [on the Support Segregation Motion,] placing the remaining child support for [AES and RJS] into an escrow account under the control of Lew's attorney, in direct contravention of the Appellate Division Order" ("Support Segregation Order").  (Compl. ¶ 115.)  Plaintiffs were not represented, "and had no opportunity to provide input into the determination."  (*Id.*)  Plaintiff subsequently obtained an attorney, Clifford Petroske, Esq., to appeal the Support Segregation Order; however, on January 10, 2012, over two years after the appeal of the Support Segregation Order was filed, the Appellate Division affirmed the Support Segregation Order.  (*Id.* ¶¶ 119, 120, 121.)

Plaintiff developed "severe mental and/or psychological injuries and damages, including Post Traumatic Stress Disorder ("PTSD")," as a result of the events that occurred on September 22, 2010.  (*Id.* ¶ 124.)  Moreover, Plaintiff "cannot be physically present" in the matrimonial area of the courthouse, nor can she enter Justice Ross's courtroom, "without experiencing severe and debilitating anxiety attacks, and heart attack like symptoms."  (*Id.* ¶ 126.)

On September 24, 2010, Plaintiff wrote to the Chief Administrative Judge of the Supreme Court, Justice Marano, to request that the Pending State Court Action be transferred to a different Justice.  (*Id.* ¶ 128.)  Plaintiff's request was not responded to and Plaintiff was unaware at that time of her rights under the ADA.  (Compl. ¶ 129.)

Soon after the events of September 22, 2010, Plaintiff and her former counsel, Reda, "filed a formal grievance against Justice Ross with the Commission on Judicial Ethics ("Commission") based on Justice Ross['s] conduct on September 22, 201[0], and on July 14,

2010." (*Id.* ¶ 130.) The investigation into Justice Ross's conduct ceased upon Justice Ross's death in April 2011. (*Id.*)

On December 2, 2010, with the help of her counsel, Reda, Plaintiff commenced an Article 78 proceeding against Justice Marber, Justice Ross, and the Clerk of the Supreme Court, based in part upon the delays in deciding the motions in the Pending State Court Action. (*Id.* ¶ 131.) Plaintiff sought a stay of the Pending State Court Action, and requested the court to vacate or suspend all previously rendered orders in the Pending State Court Action, "pending an inventory and proper certification that the Supreme Court and various justices thereof based their decisions on a full and proper record." (*Id.*) Plaintiff also requested a change of venue to an adjacent county for the Pending State Court Action because of Justice Ross's apparent inability to remain fair and neutral, and asked the Appellate Division to appoint representation for AES and RJS for the Article 78 proceeding. (*Id.* ¶ 132.) The Appellate Division denied a stay of the Pending State Court Action. (Compl. ¶ 132.) Thereafter, "[a]t the insistence of attorney Petroske," Plaintiff instructed her counsel for the Article 78 proceeding to withdraw the Article 78 proceeding. (*Id.* ¶ 145.)

"On December 2, 2010, Justice Ross issued a series of orders deciding multiple motions . . . that were at the time pending before him, and which were the subject of Justice Ross['s] unprecedented and outrageous decisional delay, which was in gross violation of DCM guidelines issued by the OCA." (*Id.* ¶ 134.) The orders were rendered notwithstanding the "discombobulated" condition of the court's records and files. (*Id.* ¶ 135.) Moreover, the orders were issued immediately after Justice Ross had been notified about the Article 78 proceeding. (*Id.* ¶ 139.)

"Justice Ross attempted to have Lew's attorney and Petroske certify to the Supreme Court that the Court had full and unaltered documents before it, but Petroske, being new to the case and in light of the literally thousands upon thousands of pages of motions and exhibits, could not and would not do so."  (*Id.* ¶ 136.)[3]  Lew's attorney admitted that she had "redacted an exhibit believed to be the court's, thereby throwing into question the accuracy, completeness and authenticity of each and every document before the Supreme Court at the time, and at present." (Compl. ¶ 137.)

Justice Ross was renowned "for his irrational and often vindictive decisions and treatment of female litigants in his court," particularly in cases involving claims of parental alienation, "as is the case in the Pending [State Court] Action."  (*Id.* ¶ 141.)

On December 14, 2010, Jan Murphy, Esq. was appointed by Justice Ross as attorney for AES and RJS.  (*Id.* ¶ 146.)  Nevertheless, Murphy met with AES and RJS only once before resigning as their attorney because of "personal reasons."  (*Id.*)  On January 24, 2011, the court next appointed Alfred Reinharz, Esq. as attorney for AES and RJS.  (*Id.* ¶ 147.)  However, 85 year-old Reinharz lacked the physical and mental vigor needed to represent AES and RJS in the highly contentious litigation.  (*Id.*)  In addition, "Reinharz was a known 'fathers' rights' advocate for many years."  (Compl. ¶ 148.)  Reinharz did not communicate with AES and RJS after his initial visit with them.  (*Id.* ¶ 149.)  AES and RJS informed Reinharz "that they would be much more comfortable with a younger, female attorney."  (*Id.*)  Reinharz did not intercede on behalf of AES and RJS in the appeal of the Support Segregation Order.  (*Id.* ¶ 151.)  Furthermore, Reinharz recommended to the court that future child support payments be placed in trust for AES and RJS to protect the funds from the " 'alienating' influence of Plaintiff."  (*Id.* ¶ 154.)

---

[3] Petroske "represent[ed] Plaintiff in the Pending [State Court] Action and appeal to the Appellate Division of the Support Segregation Order."  (Compl. ¶ 145.)

Despite Plaintiff's September 24, 2010 letter, and in contravention of an order by Justice Ross denying a motion to consolidate a pending tort case between Lew and Plaintiff with the Pending State Court Action, Justice Marano transferred the non-matrimonial tort case between Lew and Plaintiff to Justice Ross in the Matrimonial Part. (*Id.* ¶ 156.) Justice Marano's law secretary conducted a conference on March 14, 2011 to address the issues between the parties and the concerns mentioned in Plaintiff's September 24, 2010 letter and subsequent correspondence. (Compl. ¶¶ 157, 158.) At that time, Plaintiff provided the court with a letter from her psychologist which stated that it was medically contraindicated for Plaintiff to be in the Matrimonial Center or Justice Ross's courtroom. (*Id.* ¶ 159.) Reinharz was heard snoring during the conference. (*Id.*) Plaintiff argued, *pro se*, that the Pending State Court Action should be transferred to the Family Court. (*Id.*) Three days later, Justice Ross issued an order which, among other things, transferred the Pending State Court Action to the Family Court. (*Id.* ¶ 160.)

The Pending State Court Action was assigned to the Chief Administration Judge of the Family Court, Zimmerman, who almost immediately re-assigned the case to Judge Merik Aron. (*Id.* ¶ 163.) Shortly thereafter, "Zimmerman was appointed as an Acting Justice of the Supreme Court, and was assigned to replace the deceased Justice Ross as the Chief Administrative Judge of the Matrimonial Center of the Supreme Court." (Compl. ¶ 165.) Zimmerman was assigned to Justice Ross's courtroom and chambers, and was assigned the same courtroom deputy who had been present on September 22, 2010. (*Id.*)

From approximately May through July of 2012, Judge Aron conducted several court conferences and received several motions on the case, including a motion by Plaintiff to discharge Reinharz as the attorney for AES and RJS. (*Id.* ¶ 166.) However, on August 29, 2011, Zimmerman transferred the Pending State Court Action to the Supreme Court, *sua sponte*, and

reassigned the case to herself.  (*Id.* ¶ 167.)

Lew is "a generous political contributor, and Zimmerman ran for election to the Supreme Court in November 2011," and, further, "Zimmerman[] has, and continues to have[,] a close[,] out of court association with Lew's counsel, Jennifer H. Goody."  (*Id.* ¶ 172.)  While Zimmerman is the former president of the Nassau County Women's Bar association, and her law secretary is the elected president of same, Goody is a member of the Board of Directors of the same bar association.  (*Id.* ¶¶ 173, 174.)  Furthermore, Justice Marber's law secretary during the time period that Marber decided the March 9, 2008 Order, was also on the Board of Directors of the Nassau County Women's Bar Association.  (Compl. ¶ 174.)

Plaintiff filed a motion to have Zimmerman recused from the case on different grounds, including that Zimmerman had been the law secretary to the judge who had conducted the custody trial and had actively participated in those proceedings, but Zimmerman denied the motion.  (*Id.* ¶ 180.)  Among the motions that Zimmerman delayed deciding were the motions to disqualify Plaintiff's counsel, and the motion to disqualify Reinharz as counsel for AES and RJS because, *inter alia*, Reinharz failed to notify the court that AES and RJS wanted him to resign as their counsel.  (*Id.* ¶¶ 181, 182, 183.)  Zimmerman denied the motion to disqualify Reinharz. (*Id.* ¶ 184.)  Shortly thereafter, AES wrote to Weinberger regarding Reinharz's "dereliction of duties."  (*Id.* ¶ 185.)  Subsequently, Reinharz tendered his resignation as attorney for AES and RJS.  (*Id.* ¶ 186.)

In February 2012, Plaintiff commenced an Article 78 proceeding against Zimmerman, requesting a stay of prior orders pending a determination of whether Zimmerman improperly transferred the Pending State Court Action back to herself, and requesting that certain prior orders be vacated.  (Compl. ¶ 187.)  In addition, Plaintiff asked the Appellate Division to appoint

an attorney for AES and RJS in connection with the Article 78 proceeding, but the request was denied. (*Id.* ¶ 188.) While Zimmerman appointed Jill Stone, Esq. as attorney for AES and RJS on February 24, 2012, it is believed that Zimmerman failed to inform Stone about the Article 78 proceeding such that Stone could participate in the matter on behalf of AES and RJS. (*Id.* ¶¶ 192, 193.) Zimmerman also *sua sponte* reallocated Stone's fees, requiring Plaintiff to pay 75% and Lew to pay 25%. (*Id.* ¶ 221, 222.) "Stone's conduct has been a mirror image of Reinharz'[s]." (*Id.* ¶ 226.) On April 10, 2012, the Appellate Division denied all relief requested by Plaintiff in the Article 78 proceeding. (*Id.* ¶ 195.)

Despite the existence of numerous motions pending before Zimmerman, no court conferences were scheduled from September 15, 2011 until February 7, 2012. (Compl. ¶ 197.) In January 2012, Zimmerman issued orders on the pending motions, including the motion to remove Reda as Plaintiff's attorney, and set a new conference date of February 7, 2012. (*Id.* ¶ 198.) Since Plaintiff was not medically, psychologically, or emotionally able to appear in front of Zimmerman in Justice Ross's former courtroom, Plaintiff sent her husband, "who was appearing before Zimmerman on a matter related to the Pending [State Court] Action," to submit a letter to Zimmerman from Plaintiff's psychologist indicating Plaintiff's diagnosis and the contraindication. (*Id.* ¶ 199.) Plaintiff's husband also explained to Zimmerman's law secretary that Plaintiff was teaching a college class that morning and was unable to cancel her lecture on the short notice she had been given. (*Id.* ¶ 201.)

Zimmerman refused to receive the letter and had her law secretary notify Plaintiff's husband that Plaintiff was required to appear in Zimmerman's courtroom, and that the court would either issue an arrest warrant for Plaintiff or find her in default if she failed to appear or find an attorney. (*Id.* ¶¶ 200, 204.) Plaintiff "understood [this] to mean that . . . Zimmerman

would grant Lew's motion to terminate Plaintiff's support based on Plaintiff's inability to appear at a hastily convened conference, despite the fact that Plaintiff learned that her attorney had been dismissed only days earlier, and that Plaintiff had a valid medical reason for not appearing." (*Id.* ¶ 204.) Zimmerman's law secretary stated, "If she [i.e., Plaintiff] . . . is well enough to teach, she is well enough to come to court." (Compl. ¶ 202.) Plaintiff's husband procured an attorney to appear at the conference, "which was administrative for scheduling purposes, and at which no substantive issues were discussed." (*Id.* ¶ 206.) Without consulting with Plaintiff, a trial date was set for March 23, 2012. (*Id.*)

On February 2, 2012, after having received Zimmerman's January 2012 order scheduling a conference date of February 7, 2012 and disqualifying Reda, "Plaintiff wrote to . . . Marano asking for another conference akin to the one that was held on March 14, 2012, and reminding . . . Marano that he had received medical evidence concerning Plaintiff's condition at that time." (*Id.* ¶ 208.)

In addition, on or about February 3, 2012, Plaintiff left several phone messages for Truzzolino, the local ADA liaison, before receiving a return phone call. (*Id.* ¶ 207.) On or about February 9, 2012, Plaintiff told Truzzolino that she was requesting an accommodation under the ADA, namely, that she did not want any future proceedings in the Pending State Court Action to be heard in the Matrimonial Center or Zimmerman's courtroom. (*Id.* ¶ 209.) Truzzolino "represented to Plaintiff that the case would be transferred from Justice Zimmerman." (Compl. ¶ 210.) Subsequently, Plaintiff sent a letter to Truzzolino attaching a copy of her most recent psychologist's letter, and requesting that the case be transferred to a different judge, as per Truzzolino's suggestion. (*Id.* ¶ 211.) Plaintiff also asked that her letter be kept confidential. (*Id.*) However, on February 15, 2012, Marano sent a letter signed by his law secretary to

Plaintiff which questioned the veracity of Plaintiff's request and need for an accommodation under the ADA, and stated that only Zimmerman could determine whether to grant the accommodation. (*Id.* at ¶ 212.)

Plaintiff tried to contact Truzzolino subsequent to her receipt of Marano's letter, but Truzzolino refused to answer her calls. (*Id.* ¶ 214.) It was Plaintiff's understanding, based upon the official OCA website, that only Truzzolino could make the determination of whether to grant Plaintiff's request for an accommodation under the ADA. (*Id.* ¶ 215.) Plaintiff never received a notification or disposition of her demand for an accommodation, but, rather, Truzzolino wrote Plaintiff to inform her that "he had handed the matter off to Justice Marano." (Compl. ¶ 217.) "Plaintiff phoned . . . Hopkins'[s] office, and was instructed to again call [Truzzolino], which she did." (*Id.*)

AES wrote to Weinberger to notify the OCA that Stone refused to communicate with AES and RJS and failed to perform her duties. (*Id.* ¶ 229.) Although Weinberger assigned the case a file number, she did not communicate any further, unlike her prior responses to AES regarding "Reinharz'[s] dereliction of duties." (*Id.* ¶ 230.) A trial on the Support Termination Motion was scheduled for July 2, 2012. (*Id.* ¶ 231.)

### The Complaint

The Complaint asserts nine "Claim[s] for Relief." The First and Second Claims for Relief seek injunctive relief to prevent future violations of Plaintiffs' "civil, substantive and procedural due process rights." (*Id.* ¶¶ 247, 249.) Specifically, in the Complaint's Wherefore clause, Plaintiff requests "a permanent injunction preventing the Supreme Court and/or Defendant Zimmerman from presiding over, or in any manner participating in any procedural, administrative, [or] substantive aspect of the Pending [State Court] Action."

The Third Claim for Relief seeks injunctive relief to prevent future violations of Plaintiff's rights under the ADA and Rehabilitation Act. (Compl. ¶ 251.) Specifically, in the Complaint's Wherefore clause, Plaintiff requests "an order compelling Defendants to provide Plaintiff with reasonable accommodation as required under the ADA and Rehabilitation Act, and enjoining any further proceedings in the Pending [State Court] Action[] in the Supreme Court until [the] time . . . such accommodation is granted."

The Fourth Claim for Relief alleges violations of Plaintiffs' equal protection rights, (*id.* ¶ 253), and, according to the Complaint's Wherefore clause, seeks the "appointment of a diligent and competent attorney to represent" AES and RJS in the Pending State Court Action, and "for the fees of such attorney to be paid and chargeable to the OCA as provided for in the [relevant laws], and a stay of all proceedings in the Pending [State Court] Action until such time as the rights and interests of [AES and RJS] are fully and properly safeguarded."[4]

The Fifth Claim for Relief alleges that that the "withholding of the escrowed child support money from [AES and RJS] was a taking of property without due process of law," (*id.* ¶ 256), and Plaintiff seeks, according to the Complaint's Wherefore clause, "an order releasing to [AES, RJS] and Plaintiff the child support which is presently being held in escrow, and issuance of an order directing that no party other than [AES and RJS] have any right, title, interest or entitlement to said money."

The Sixth Claim for Relief alleges that "there are no assurances or circumstantial guarantees that any or all of the motions decided by the Supreme Court were decided based on a

---

[4] The Complaint does not clarify whether it asks this Court to appoint an attorney for AES and RJS in the Pending State Court Action or instead asks this Court to compel Defendants to provide an attorney for AES and RJS in the Pending State Court Action. Nevertheless, regardless of the relief sought, and in addition to the grounds for dismissal discussed *infra*, this claim is dismissed as moot because Stone was appointed to act as attorney for AES and RJS. (*See* Compl. ¶ 192.)

complete and unaltered set of motion papers, responsive papers and other submissions" because of "the admittedly incomplete and unauthenticated condition of the Supreme Court's files as maintained by the Clerk of the Court, the Supreme Court, and the County Clerk." (*Id.* ¶ 260.) According to the Complaint's Wherefore clause, Plaintiff requests "a permanent stay of . . . every order issued in the Pending Action by Justices Ross and Marber," and "an order and/or mandatory injunction compelling defendants[] . . . to inventory and certify to the satisfaction of this Court that the files and submissions underlying each and every motion submitted and decided in the Pending [State Court] Action [have been] inventoried and authenticated as . . . complete and accurate." Similarly, the Seventh Claim for Relief states that "Plaintiff[, AES and RJS] are entitled to have the operation of each and every order and judgment rendered against them by Justice Ross [and] Justice Marber permanently stayed and enjoined." (*Id.* ¶ 269.)

The Eighth Claim for Relief asserts that Plaintiff is entitled to monetary damages of no less than $1,000,000 because Plaintiff has "been forced to expend significant sums of money on attorney[s'] fees and on motions, appeals and related proceedings, all occasioned by the improper, malicious, and illegal conduct of various Justices of the Supreme Court and the Appellate Division." (*Id.* ¶ 271.)

The Ninth Claim for Relief alleges that AES and RJS "have been deprived of the use and enjoyment and benefit of the escrowed child support money, . . . which was taken without due process," and seeks monetary damages for the alleged deprivation. (Compl. ¶¶ 275, 277, 278.)

Defendants move to dismiss the complaint on the basis of the *Younger* abstention doctrine, absolute judicial immunity, the domestic relations exception to federal jurisdiction, Eleventh Amendment immunity, and the failure to state a claim under Title II of the ADA. For the reasons stated below, the Court grants Defendants' motion.

***DISCUSSION***

**I.**     ***Motion to Dismiss for Lack of Subject Matter Jurisdiction: Legal Standard***

A case may properly be dismissed for lack of subject matter jurisdiction pursuant to Rule

12(b)(1) "when the district court lacks the statutory or constitutional power to adjudicate it."

*Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). "In contrast to the standard for a

motion to dismiss for failure to state a claim under Rule 12(b)(6), a 'plaintiff asserting subject

matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists.'"

*Mac Pherson v. State St. Bank & Trust Co.*, 452 F. Supp. 2d 133, 136 (E.D.N.Y. 2006) (quoting

*Makarova*, 201 F.3d at 113), *aff'd*, 273 F. App'x 61 (2008); *see also Tomaino v. United States*,

2010 WL 1005896, at *1 (E.D.N.Y. Mar. 16, 2010). Defendants assert several grounds for

dismissal pursuant to Rule 12(b)(1); however, since the Court finds that the following grounds

provide sufficient bases for dismissal of the Complaint, it need not address the additional

grounds for dismissal pursuant to Rules 12(b)(1) and 12(b)(6) submitted by Defendants.

**A.**     ***The Domestic Relations Exception to Federal Jurisdiction***

Defendants assert that the Complaint should be dismissed under the domestic relations

exception, which "divests the federal courts of power to issue divorce, alimony, and child

custody decrees." *Ankenbrandt v. Richards,* 504 U.S. 689, 703 (1992). The root of the domestic

relations exception to federal subject matter jurisdiction stems from "the policy consideration

that the states have traditionally adjudicated marital and child custody disputes and therefore

have developed competence and expertise in adjudicating such matters, which federal courts

lack." *Thomas v. New York City,* 814 F. Supp. 1139, 1146 (E.D.N.Y. 1993) (citing *Ankenbrandt,*

504 U.S. at 703-04). Thus, federal courts recognize that "[t]he whole subject [of the] domestic

relations of husband and wife, parent and child, belongs to the laws of the states, and not to the laws of the United States." *In re Burrus,* 136 U.S. 586, 593-94 (1890).

While the domestic relations exception is "very narrow," *Williams v. Lambert,* 46 F.3d 1275, 1283 (2d Cir. 1995), the exception "applies generally to issues relating to the custody of minors," as well as to "civil rights actions directed at challenging the results of domestic relations proceedings." *Mitchell-Angel v. Cronin,* 1996 WL 107300, at *2 (2d Cir. March 8, 1996) (citations omitted).

In this case, while Plaintiff ostensibly alleges violations of the state and federal constitutions, as well as of the ADA and Rehabilitation Act, the relief ultimately sought by Plaintiff does not seek redress for such violations separate and apart from the domestic relations matters, but, rather, seeks to directly undo the effects of the domestic relation orders and judgments previously rendered in the Pending State Court Action. For example, Plaintiff's Fifth Claim for Relief asks this Court to release the child support money that is presently being held in an escrow account pursuant to court order, and to issue an order providing that only AES and RJS have right to the child support money;[5] Plaintiff's Sixth Claim for Relief asks this Court to permanently stay the operation of each and every order issued by Justices Ross and Marber in the Pending State Court Action; and Plaintiff's Seventh Claim for Relief seeks a permanent injunction staying every order, decision and judgment rendered against Plaintiff or affecting the rights or interests of AES and RJS. In addition, Plaintiff's ninth claim seeks damages on behalf of AES and RJS to compensate them for their inability to enjoy and benefit from the child support money that was held in escrow. Thus, rather than ask the Court to adjudicate the constitutionality of the state's laws or procedures employed during the Pending State Court

---

[5] Notably, Plaintiff appealed the Supreme Court's order that required the child support money to be placed in escrow, but her appeal was denied by the Appellate Division.

Action, Plaintiff asks the Court to "undo" the domestic relations orders issued by the state courts, including the Family Court, Supreme Court and Appellate Division. However, under the domestic relations exception, this Court cannot and will not provide the relief Plaintiff seeks. Plaintiff's complaint is, in effect, a civil rights action directed at challenging the results of domestic relations proceedings, and, in particular, a state court's decisions regarding child support. *See, e.g.*, *Schottel v. Kutyba*, 2009 WL 230106, at *1 (2d Cir. Feb. 2, 2009) ("[A] plaintiff cannot obtain federal jurisdiction merely by rewriting a domestic dispute as a tort claim for monetary damages"); *Ruchinsky v. Devack*, 2014 WL 2157533, at *10 (E.D.N.Y. May 23, 2014) ("Plaintiff cannot avoid operation of the domestic relations exception by re-casting his challenge to the state court's child support decisions as a Civil RICO claim."). Accordingly, this Court does not have jurisdiction to hear these claims. *See Donohue v. Pataki*, 28 F. App'x 59, 60 (2d Cir. 2002) (affirming "district court's conclusion that it lacked jurisdiction to invalidate or otherwise review the state court's decision [regarding] . . . child support payments"); *McArthur v. Bell*, 788 F. Supp. 706, 709 (E.D.N.Y. 1992) (stating that when the allegations regarding, *inter alia*, constitutional rights "are directly related to" domestic relations proceedings, the Court must dismiss the claims because, otherwise, the "Court would be forced to re-examine and re-interpret all the evidence brought before the state court in the domestic relations proceedings," and "[t]hat is the role of the Appellate Division").

### B. *The Younger Abstention Doctrine*

To the extent Plaintiff seeks injunctive relief pertaining to the Pending State Court Action, the *Younger* abstention doctrine and its progeny prohibit this Court from exercising jurisdiction over this matter, which concerns an ongoing proceeding in state court. *See Younger v. Harris*, 401 U.S. 37, 44 (1971). *Younger* abstention is mandatory when: (1) there is an

ongoing state proceeding; (2) an important state interest is involved; and (3) the plaintiff has an adequate opportunity for judicial review of his constitutional claims during or after the proceeding. *Spargo v. N.Y. State Comm'n on Judicial Conduct*, 351 F.3d 65, 75 (2d Cir. 2003).

### 1. *The Younger Elements*

In this case, there is no dispute that there is an ongoing state proceeding, i.e., the Pending State Court Action. However, Plaintiff argues that the Pending State Court Action is not the type of proceeding that triggers *Younger* abstention. According to Plaintiff, *Younger* abstention applies only when the state court proceeding is "remedial," rather than "coercive," in nature. Plaintiff cites the case *Donohue v. Mangano*, 886 F. Supp. 2d 126 (E.D.N.Y. 2012), in support of her argument. In *Donohue*, the court analyzed how different federal courts treat the distinction between state remedial and coercive actions in the context of *Younger* abstention. *Id.* at 144-47. The *Donohue* court observed that the "circuits are not uniform in their application of the remedial/coercive distinction in the abstention context," and that the "circuits disagree not only about whether the coercive-remedial distinction matters, but also how to tell the difference." *Id.* at 145. Some courts describe a coercive state court proceeding as "a state-initiated enforcement action in which the plaintiff does not have a choice to participate," while a remedial proceeding is one "in which the plaintiff initiated an option to seek a remedy for the state's wrongful action." *Id.* (citation and internal quotation marks omitted). On the other hand, the Third Circuit describes a remedial state court proceeding as one in which "the plaintiff is attempting in both state and federal courts to vindicate a wrong inflicted by the state," whereas "in coercive state proceedings, the federal plaintiff is the state court defendant, and the state proceedings were initiated to enforce a state law." *Id.* (citation and internal quotation marks omitted).

Importantly, while the *Donohue* court noted that numerous circuits find that federal courts should abstain under *Younger* only when the state proceedings are coercive, rather than remedial, it also observed, as argued by Defendants, that "[t]he Second Circuit has not expressly ruled on this issue." *Id.* at 145-46. In addition, in determining that the federal court proceeding in *Donohue* was "not the type of parallel state court proceeding for which a federal court must abstain under *Younger*," the *Donohue* court reasoned that the plaintiffs were not attempting to use the "federal court to shield [them] from state enforcement efforts." *Id.* at 147 (citation and internal quotation marks omitted).

Here, the Court is mindful that the Second Circuit has not expressly forbidden *Younger* abstention when the state court proceedings are remedial. Moreover, even if the Pending State Court Action could be considered remedial in nature because Plaintiff is attempting to vindicate a wrong inflicted by the state in both the state and federal courts, Plaintiff is simultaneously attempting to use the federal court to shield herself from the state court's enforcement of its orders and judgments. As discussed previously, Plaintiff seeks to stay the operation of every order, decision and judgment in the Pending State Court Action which was rendered against her, or which affects the rights or interests of AES and RJS. Thus, because the *Younger* doctrine requires "federal courts [to] generally refrain from enjoining or otherwise interfering in ongoing state proceedings," *Spargo*, 351 F.3d at 74, the Court finds that the first element of the *Younger* abstention doctrine has been satisfied in this case.[6]

---

[6] Numerous other courts in this Circuit have abstained under the principles enunciated in *Younger* in the context of federal actions challenging the custody and visitation rulings of a state court. *See, e.g.*, *McKnight v. Middleton*, 699 F. Supp. 2d 507, 520 (E.D.N.Y. 2010), *aff'd*, 434 F. App'x 32 (2011); *Neustein v. Orbach*, 732 F. Supp. 333, 341-42 (E.D.N.Y. 1990); *Thompson v. Vacco*, 1997 WL 539949, at *2-5 (S.D.N.Y. Aug. 29, 1997).

Moreover, the second and third elements have also been met. "As regards the second element, it hardly bears repeating that state courts have a paramount if not exclusive interest in child custody cases." *Neustein*, 732 F. Supp. at 341; *see also McKnight*, 699 F. Supp. 2d at 520 ("[T]he heart of this case is a child custody dispute, a matter rightfully reserved for state courts."). In addition, the third element has been met, as "Plaintiff has had more than sufficient opportunity to litigate the federal issues in state courts, which are fully competent to decide federal constitutional questions." *Neustein*, 732 F. Supp. at 342. It is noteworthy that Plaintiff repeatedly availed herself of the state courts, including the Appellate Division, to litigate many of the same issues she now asks this Court to consider, and while the Complaint is unclear as to whether Plaintiff asserted any constitutional claims at those times, she had adequate opportunity to do so.

### 2. *The Younger Exceptions*

The Supreme Court has recognized that "bad faith [and] harassment" constitute "narrow" exceptions to *Younger* abstention. *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 435 (1982); *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 611 (1975). "[F]or a federal plaintiff to invoke the bad faith exception, 'the party bringing the state action must have no reasonable expectation of obtaining a favorable outcome.'" *Diamond "D" Constr. Corp. v. McGowan*, 282 F.3d 191, 199 (2d Cir. 2002) (quoting *Cullen v. Fliegner*, 18 F.3d 96, 103 (2d Cir. 1994)). Thus, the Second Circuit has stated that "a refusal to abstain would be justified where a 'proceeding has been brought to retaliate for or to deter constitutionally protected conduct, or where a prosecution or proceeding is otherwise brought in bad faith or for the purpose to harass.'" *Id.* at 199 (quoting *Cullen*, 18 F.3d at 103-04). Critical to this analysis, is the Second Circuit's guidance that:

> A state proceeding that is legitimate in its purposes, but unconstitutional in its execution—even when the violations of constitutional rights are egregious—will not warrant the application of the bad faith exception. To invoke this exception, the federal plaintiff must show that the state proceeding was initiated with and is animated by a retaliatory, harassing, or other illegitimate motive.

*Id.* (internal citation omitted).

As a preliminary matter, the Pending State Court Action was brought by Lew, not the Defendants. Furthermore, the Pending State Court Action, and Defendants' roles in those proceedings, were legitimate in their purpose, viz. to determine Lew's child custody and child support obligations, and, therefore, even if Defendants' execution of the state proceedings was unconstitutional to any degree, the bad faith or harassment exception does not apply.

The Supreme Court has also recognized an exception to *Younger* abstention when "some other extraordinary circumstance . . . would make abstention inappropriate." *Middlesex Cnty. Ethics Comm.*, 457 U.S. at 435. The Supreme Court has elaborated that:

> Only if "extraordinary circumstances" render the state court incapable of fairly and fully adjudicating the federal issues before it, can there be any relaxation of the deference to be accorded to the state criminal process. The very nature of "extraordinary circumstances," of course, makes it impossible to anticipate and define every situation that might create a sufficient threat of such great, immediate, and irreparable injury as to warrant intervention in state criminal proceedings. But whatever else is required, such circumstances must be "extraordinary" in the sense of creating an extraordinarily pressing need for immediate federal equitable relief, not merely in the sense of presenting a highly unusual factual situation.

*Kugler v. Helfant*, 421 U.S. 117, 124–25 (1975) (footnote omitted). Although "*Kugler* spoke in the context of criminal prosecutions, the same standard applies in the civil context." *Diamond "D" Constr.*, 282 F.3d at 201 (citing *Moore v. Sims*, 442 U.S. 415, 433 (1979)).

Thus, under *Kugler's* definition of extraordinary circumstances, there are two bases for application of the "extraordinary circumstances" exception, i.e., (1) there is "no state remedy available to meaningfully, timely, and adequately remedy the alleged constitutional violation";

and (2) that the plaintiff "will suffer 'great and immediate' harm if the federal court does not intervene." *Id.* (citing *Trainor v. Hernandez*, 431 U.S. 434, 441–42 & n.7 (1977)). In this case, however, Plaintiff has failed to allege the existence of these predicates. While Plaintiff alleges "decisional delay" by the Supreme Court Justices and Appellate Division in rendering decisions, she fails to allege that there is no state process that could timely and adequately remedy the alleged constitutional violations. Similarly, Plaintiff does not allege or present any argument that she will suffer great and immediate harm if this Court does not intervene. Accordingly, Plaintiff has not alleged extraordinary circumstances that would prevent application of *Younger* abstention.

**3.** ***The Claims Asserted On Behalf of AES and RJS***

Plaintiff asserts that *Younger* abstention is inappropriate for the claims asserted on behalf of AES and RJS because AES and RJS were not parties to the Pending State Court Action. In support of this assertion, Plaintiff cites *Donohue*, which states that, "[g]enerally, 'where the plaintiff in a federal action is not a party to the state proceeding, *Younger* concerns about federal adjudication do not arise.' " 886 F. Supp. 2d at 143 (quoting *Sullivan v. City of Pittsburgh, Pa.*, 811 F.2d 171, 177 (3d Cir.1987)). However, *Donohue* further states that, "in certain circumstances, *Younger* may apply to the claims of third-parties who are not directly involved in any pending state proceeding." *Id.* (quoting *Spargo*, 351 F.3d at 82) (internal quotation marks omitted). "[T]he parties in federal and state court need not be identical [for *Younger* purposes,] 'where the interests of the parties seeking relief in federal court are closely related to those of parties in pending state proceedings and where the federal action seeks to interfere with pending state proceedings.' " *Cedar Rapids Cellular Tel., L.P. v. Miller*, 280 F.3d 874, 881-82 (8th Cir. 2002) (quoting *Womens Servs., P.C. v. Douglas*, 653 F.2d 355, 358 (8th Cir. 1981)).

Defendants argue that *Younger* abstention is appropriate because AES and RJS were the subject of the Pending State Court Action. In addition, Defendants argue that AES and RJS are represented by Stone in the Pending State Court Action, and that Stone, as their attorney, fully participates in the Pending State Court Action on their behalf. The Court agrees. While AES and RJS are not named parties in the Pending State Court Action, they are directly involved in that action as they are among the subjects of it, and the interests they seek to protect in federal court are the same interests that Stone is legally required to protect in the Pending State Court Action. *See In re TM*, 2008 WL 880192, at *4 (N.Y. Fam. Ct. Feb. 20, 2008) ("The Law Guardian's statutory duty is to provide the child with 'independent representation.' "). Thus, the Court declines "to apply *Younger* in a mechanical fashion," when it is clear that *Younger* abstention is appropriate under the present circumstances. *Spargo*, 351 F.3d at 81. Based upon the foregoing, *Younger* abstention is appropriate on all of the Complaint's counts seeking injunctive relief affecting the Pending State Court Action.[7]

---

[7] Although the Third, Fifth and Sixth Claims for Relief seek orders rather than injunctions, the orders sought are intended to compel the Defendants to do something. Thus, since the orders sought in those Claims for Relief would serve as the functional equivalents of injunctions, those Claims for Relief should also be barred by the *Younger* abstention doctrine. *See Central States, Southeast and Southwest Areas Pension Fund v. Wintz Properties, Inc.*, 155 F.3d 868, 873-74 (7th Cir. 1998) (stating that "the underlying order compelling [action] looks like an injunction" because "[t]he order instructs [the defendant] to do something . . . which after all is the point of an injunction"). Indeed, Plaintiff apparently views these claims as seeking injunctive relief. For example, on pages 31-32 of Plaintiff's Memorandum in Opposition, when discussing the Third Claim for Relief, Plaintiff states: "A review of Defendant[s'] memorandum of law shows that it misapprehends the nature of the relief sought. Plaintiff does NOT ask this Court to rule or determine, at present, the proper ADA accommodation to which Plaintiff may be entitled[; she] simply seeks an affirmative injunction requiring the State Court to use appropriate mechanisms to make a determination of the proper ADA accommodations that ought to be granted." Thus, Plaintiff concedes that the order she seeks is actually a request for injunctive relief concerning the Pending State Court Action. In addition, Plaintiff confirms that she is not asking the Court to determine whether her rights were actually violated under the ADA or Rehabilitation Act, but, rather, asks the Court to compel the Defendants to determine her entitlement to an accommodation under those laws, thereby also implicitly conceding that the state courts are capable of adjudicating her rights under those laws.

## *CONCLUSION*

For the foregoing reasons, Defendants' motion to dismiss the Complaint is granted. The

Clerk of the Court is directed to close this case.

**SO ORDERED.**

Dated: Central Islip, New York
June 18, 2014

_____/s/_____
Denis R. Hurley
Unites States Senior District Judge